UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL BULLOCK,<br><br>      **Plaintiff,**<br><br>      v.<br><br>AMERICAN SECURITY PROGRAM, INC.,<br><br>      **Defendant.** | Civil Action No. 16-1645 (JEB) |

**MEMORANDUM OPINION**

George Burns once quipped that the secret to a good sermon involves having a good beginning and a good ending, and to have the two as close together as possible. Whether or not this is true of sermons, *pro se* Plaintiff Michael Bullock admittedly tests the limits of this axiom as applied to pleading a claim here. In his four-sentence Complaint, he asserts that his former employer, Defendant American Security Program, Inc., breached a settlement agreement with him and his union by failing to help him get a new job at one of its worksites. ASP now moves to dismiss his Complaint for failure to state a claim. As the Court concludes that Bullock's Opposition provides sufficient additional facts to state a plausible right to relief under Section 301 of the Labor Management Relations Act, it will deny the Motion.

**I.  Background**

The Court, as it must at this stage, draws the facts from Plaintiff's one-paragraph Complaint and his Opposition to the Motion to Dismiss. See Brown v. Whole Foods Market Gr., Inc., 789 F.3d 146, 152 (D.C. Cir. 2015) (holding district court must consider all *pro se* litigant's allegations when considering a motion to dismiss, including those found in plaintiff's

opposition). Because Plaintiff also incorporates by reference several emails attached to his Opposition, the Court considers him to have pled the facts contained in those communications as well.

Defendant American Security Programs employed Bullock as a security guard from August 24, 2010, to November 27, 2013. See ECF No. 8 (Opposition) at 1. In May 2013, Bullock worked at a site controlled by the Federal Protective Service. Id. This position required a suitability determination, which is similar to a security clearance. Id., Exhs. 7, 9, 12. FPS, not the employer, issues such determinations after an investigation into an applicant's background. See ECF No. 8, Exh. 9 (Response to Level III Grievance) at 1.

On May 9, 2013, ASP realized that Bullock did not actually possess an active suitability determination and consequently suspended his employment at the FPS site. See Resp. to Grievance at 2. Plaintiff filed a complaint challenging this suspension with his Union — the United Government Security Officers of America International Union — as required under a Collective Bargaining Agreement between the Union and ASP. See Opp. at 1. Pursuant to the CBA, the Union and ASP then negotiated Bullock's grievance through several stages of a mandatory process. See Opp., Exhs. 1-9, 12. At the third step in this process, ASP's Senior Vice President, Jeffrey Roehm, provided the Company's formal "response" to the grievance, explaining that ASP had submitted paperwork to FPS when Bullock came on board in 2011 to request that the agency recognize and apply his suitability determination from his previous employer. See Resp. to Grievance at 1. ASP's response further asserted, however, that on February 27, 2013, an internal audit revealed that FPS had never acted on that 2011 request, thus forcing the Company to renew its request to transfer Bullock's suitability determination. Id. at 2. According to the Company, FPS responded three months later to this renewed request by stating

that it had already found Bullock unsuitable two years prior, in March 2011, after unsuccessfully attempting to resolve several issues with him. Id. Based on these facts, ASP claimed in its response letter that it had no choice but to suspend Bullock until he could obtain the requisite suitability determination. Id.

This same letter also contained ASP's proposed resolution to Bullock's grievance, laid out in three commitments. Id. at 4. The Company first articulated that it "want[ed] to help him have an opportunity to resolve his 'issues' with FPS, and help to put him back to work as soon as possible." Id. ASP, however, also "reiterate[ed]" that the suitability determination "is between himself and FPS," and thus the Company could only help him resubmit paperwork for the government's ultimate processing and determination. Id. ASP next promised that "[i]f and when Mr. Bullock receives his favorable suitability from FPS, ASP will make every effort to find him suitable employment on an ASP/FPS contract." Id. Finally, the Company asserted that its "offer still stands to work with Mr. Bullock to try to find him work on a non-FPS site during the interim period." Id.

Neither the Union nor the Company subsequently escalated the grievance to the fourth stage of the CBA process — *i.e.*, referral for binding arbitration. See Opp, Exh. 12 at 1. Bullock instead proceeded to interview for a non-FPS worksite in Maryland on September 25, 2013. See Opp. at 2. The very same day, the Union emailed Roehm to affirm that Bullock had agreed to pick an available non-FPS location to work at until such time as his "suitability comes back." Opp., Exh. 12 at 1. The Union's email further noted that ASP had agreed to change his "termination status" to "transfer/pending status" until FPS made the new determination. Id. Three hours later, Roehm responded to this email and agreed to the Union's terms with "one qualification: Mr. Bullock must choose a site to work, and begin to work, within the next 30-

days or we will not carry him any longer as a[n] active employee. If his suitability were to be approved after he is removed from the company roles [*sic*], and he wishes to again be employed by ASP, he would have to reapply for employment." Id.

Over the next two weeks, Bullock completed the required training for an available non-FPS post with the Company. See Opp. at 2; Id., Exhs. 11, 13. He could not, however, reach either Roehm or the ASP manager of that worksite, as they were out on vacations, to confirm his assumption of this position. See Opp. at 2. On November 26, 2013, he also learned that ASP had not returned a form to the State of Maryland for his handgun permit, which he also needed to obtain for the new position. See Opp., Exh. 14. Maryland thus denied him the permit. Id. The pleadings do not indicate what happened thereafter, although Bullock says he continued to be unemployed. See Opp. at 4. The Court thus infers that he was terminated and never reinstated to a new worksite by ASP.

On July 22, 2016, nearly three years later, Bullock filed this *pro se* action in the District of Columbia Superior Court alleging a breach-of-contract claim. See ECF No. 1-1 (Complaint). His Complaint in its entirety reads:

> As an employee of ASP working on a FPS government site, I was removed from the worksite because of my clearance. There was an agreement between myself, ASP and my union, UGSOA, to have me transferred to a non-FPS government site. This agreement was agreed upon in November 2013. ASP never held up to their side of agreement.

Id. Having removed the case to this Court based on diversity jurisdiction, ASP now moves to dismiss the Complaint in its entirety. See ECF No. 5 (Motion to Dismiss).

**II.   Legal Standard**

The Federal Rules of Civil Procedure require a plaintiff to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Federal Rule of Civil Procedure 12(b)(6), in turn, provides for the dismissal of an action where such a complaint fails "to state a claim upon which relief can be granted."

In evaluating a Rule 12(b)(6) motion, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted). The pleading rules are "not meant to impose a great burden," see Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and "detailed factual allegations" are thus not necessary, see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  A complaint, however, "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)). The facts instead "must be enough to raise a right to relief above the speculative level" even if "recovery is very remote and unlikely." Twombly, 550 U.S. at 555-56 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). While a *pro se* pleading is held to "less stringent standards than formal pleadings drafted by lawyers, [it] must nonetheless plead factual matter that permits [the Court] to infer more than the mere possibility of misconduct." Brown, 789 F. 3d at 150 (internal quotations and citations omitted).

**III.   Analysis**

In pressing its Motion to Dismiss, ASP advances three arguments.  It first contends that the Complaint does not point to a binding agreement between ASP and the Union to place

5

Bullock on a non-FPS worksite and thus fails to state a plausible breach-of-contract claim. See Mot. at 9-11. The Company next asserts that, even if such a contract exists, any common-law contract claim that ASP breached that agreement is preempted by Section 301 of the Labor Management Relations Act. Id. at 11-13. Finally, ASP argues that, even if the Court treats Bullock's claim as pled under the LMRA, it cannot survive because he never exhausted the CBA's mandatory grievance procedures before filing this action. Id. at 13-15. Taking up each of these arguments sequentially, the Court concludes that Bullock's common-law contract claim is indeed preempted by Section 301, but his Complaint nevertheless survives because he has stated a plausible right to relief under that provision of the LMRA.

There is little need to linger on ASP's first argument about the elements required to establish a viable breach-of-contract claim under District of Columbia law. Regardless of whether, in the abstract, the Union and ASP's communications during the grievance process would normally form an enforceable contract under such laws, the CBA here explicitly provides that "[a]ny dispute or grievance not processed or appealed by the Union within the time limits set forth in any Step shall be considered settled on the basis of the Employer's last preceding Answer." ECF No. 5-2 (Collective Bargaining Agreement), Section 16.6 at 19. The Court understands Bullock to base his claim in this action on ASP's documented answer at Step III of his suspension-grievance process. See Opp., Exh. 9. Under the CBA, then, Roehm's response letter plausibly constitutes settlement of that grievance, which Bullock could theoretically seek to enforce.

The Company is correct, however, that any such claim is preempted by Section 301 of the LMRA and thus cannot proceed as a common-law contract cause of action. Section 301 grants federal courts jurisdiction over disputes "for violation of contracts between an employer

and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). This provision thus serves as the basis for federal preemption of "any statute cause of action for violation of contracts between an employer and a labor organization." Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 23 (1983) (internal quotation marks omitted). When a state-law claim fits this description, "that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220 (1985). This is so even where the relevant labor contract between the union and employer – here, the settlement agreement – is not itself a CBA. See Retail Clerks Int'l Ass'n v. Lion Dry Goods, Inc., 369 U.S. 17, 26 (1962) (holding Section 301 provides "[a] federal forum . . . for actions on other labor contracts besides collective bargaining contracts").

The settlement agreement that Bullock points to here is clearly a "contract[] between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a); see also Olson v. Bemis Co., Inc., 800 F.3d 296, 300-304 (7th Cir. 2015) (holding grievance settled through CBA process preempted by Section 301 and collecting cases for same); see also Davis v. Bell Atl.-W. Va., Inc., 110 F.3d 245, 249 (4th Cir. 1997); Jones v. Gen. Motors Corp., 939 F.2d 380, 382-83 (6th Cir. 1991). The emails and letters he relies on for the formation of this agreement are between the Union and ASP alone, despite Bullock's characterization of them in his Complaint. See ECF No. 8, Exhs. 6-9, 12. He, in fact, is not even copied on them. Id. The Court thus concludes that his breach-of-contract claim is squarely preempted by Section 301 and, as a result, must either be treated as such or dismissed. Allis-Chalmers, 471 U.S. at 220.

ASP, not surprisingly, argues that either path leads to the same result – *viz.*, dismissal. The Company points out that Bullock never claims that he pursued the grievance process

established by the CBA for the alleged breach of the settlement agreement before bringing this action. To be sure, "[o]rdinarily . . . an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement" before heading to court with a Section 301 claim, see DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 163 (1983), and this "principle applies equally to the alleged breach of a settlement agreement as to the dispute that sparked the grievance in the first place." Olson, 800 F. 3d at 303.

This exhaustion requirement, however, is not absolute. Id. At least sometimes, an "employee's claim is not subject to mandatory alternative-dispute resolution (under the CBA or otherwise), [and] he can bring a straightforward breach of contract suit under § 301, which closely resembles an action for breach of contract cognizable at common law," without first going through a CBA-mandated grievance process. Id. (citations and quotation marks omitted). Bullock appears to base his claim here on the Company's failure to assist him in finalizing his new job at the non-FPS worksite, as well as its failure to respond to the inquiry about his handgun permit.

ASP does not explain where the CBA at issue in this case requires exhaustion of either of these underlying actions. The Company instead relies only on a single case, Robinson v. Wash. Metro. Area Transit Auth., 167 F. Supp. 3d 118 (D.D.C. 2016), to argue that a grievance settlement is always subject to the mandatory grievance procedures found in the CBA. See ECF No. 9 (Reply) at 7-8. In Robinson, however, the settlement explicitly provided that any dispute arising from it would be subject to the CBA's mandatory grievance process. See 167 F. Supp. 3d at 135-36. No such provision exists in the purported settlement agreement here. The relevant CBA, too, appears to only require that "discharge and discipline matters shall be subject to the grievance and arbitration procedures contained in this Agreement." CBA, Section 16.1 at 14.

8

Neither of the actions on which Bullock rests his claim appears at first blush to necessarily fall within the typical meaning of these terms, and ASP makes no such supportive textual argument at this stage. The Company instead simply claims that <u>all</u> disputes over such settlement agreements must be exhausted through the CBA's grievance procedures without citing to any case in our circuit that supports such a sweeping rule. There is, in fact, an apparent circuit split over how to treat the breach of side agreements in relation to a CBA's mandatory grievance procedures. See <u>United Steelworkers of Am. v. Cooper Tire & Rubber Co.</u>, 474 F.3d 271, 278-79 (6th Cir. 2007) (discussing circuit split). The issue is thus not appropriate for disposition at this early stage of the litigation, especially given the lack of thorough briefing on this important matter of law. <u>Accord</u> <u>Olson</u>, 800 F.3d at 304 (declining to apply in-circuit presumption at motion-to-dismiss stage even with settlement agreement in record).

While it may turn out that the CBA required Bullock to exhaust his alternative-dispute procedures for this claim or that the Company has other valid defenses, the Court at this point concludes that Plaintiff has done enough to "raise a right to relief above the speculative level," even if "recovery is very remote and unlikely." <u>Twombly</u>, 550 U.S. at 555-56 (citing <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)). As a result, it will allow his claim to proceed under Section 301 of the LMRA as pled.

## IV. Conclusion

For the reasons articulated herein, the Court will issue a contemporaneous Order denying Defendant's Motion to Dismiss.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  October 31, 2016